IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WINDSTREAM, Corporation, <br> WINDSTREAM NEBRASKA, Inc., <br> WINDSTREAM SYSTEMS OF THE <br> MIDWEST, INC., and WINDSTREAM <br> BENEFITS COMMITTEE, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | 4:08CV3173 |
| v. | ) <br> ) | |
| ROBERT BERGGREN, Individually and as a Representative of Persons Similarly Situated, LAURIE BAXTER, NEIL BRAUCH, LARRY CHUBB, VIRGINIA DANCZAK, KENNETH DARBY, ROY EDMONDS, DIANE GIEBELHAUS, KENNETH GRAHAM, BONNIE HATRA, HOWARD HIGHT, JUDY HIGHT, LONNIE HUSING, EDWARD JUNGCK, ERVIN MATHER, ROBERT SWAILS, MARY WADE, and DALE WEAVER, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION |
| Defendants. | ) <br> ) | |

Now before me is the individually-named defendants' motion for a preliminary injunction, filing 164.[1] The defendants seek to prevent the plaintiffs from altering certain retirement benefits until after the merits of the plaintiffs' claims and the defendants' counterclaims are finally resolved. A hearing on the plaintiff's motion was held on December

---

[1] Communications Workers of America Union Local No. 7470 was originally named as a defendant in this action, but has since been dismissed. (See filings 168-169.) Hereinafter, the term "defendants" will be used to refer to the remaining defendants (i.e., the individually-named defendants).

I note parenthetically that a motion to dismiss filed by the Union remains listed as "pending" on the docket sheet; that motion will be denied as moot.

1

15, 2008. I have considered the documents and testimony presented at the hearing, along with the briefs submitted by the parties, and I find that the defendants' motion must be denied. My findings of fact and conclusions of law are set forth below. See Fed. R. Civ. P. 52(a)(2).

## I. BACKGROUND

Plaintiff Windstream Corporation is the plan sponsor of the Windstream Comprehensive Plan of Group Insurance (the Windstream Plan). (Am. Compl., filing 93, ¶ 1.) Plaintiffs Windstream Nebraska, Inc., and Windstream Systems of the Midwest, Inc., are wholly-owned subsidiaries of Windstream Corporation. (Id. ¶¶ 2-3.) Plaintiff Windstream Benefits Committee is the administrator of the Windstream Plan. (Id. ¶ 4.) The defendants are former employees of Aliant Communications Co., which was previously known as Lincoln Telephone & Telegraph Co., and are covered by the Windstream Plan. (Id. ¶¶ 6-22; Answer, filing 164, ¶¶ 6, 33-34.)

Lincoln Telephone & Telegraph Co. (LT&T) maintained an "Employee Handbook" that described the benefits available to LT&T employees. (Defs.' Exs. 11-12.) The 1987 version of the handbook includes the following "reservation of rights":

> LT&T intends to continue these benefit plans indefinitely. The Company reserves the right to modify, suspend, or terminate these benefits. A change, however, will not deprive you of your rights to any benefits to which you may have acquired a permanent right.

(Defs.' Ex. 12 at B-10.) The 1993 version of the book contains nearly identical language. (See Defs.' Ex. 11 at B-11.)

In 1996, LT&T changed its name to Aliant Communications Co. (Aliant). (See Counterclaim, filing 164, ¶ 1; Answer to Counterclaim, filing 193, ¶ 1.) Aliant sponsored the Aliant Communications Health Care Program (the Aliant Plan), which provided medical benefits for Aliant's retirees. (Pls.' Ex. 2, Boyd Aff. ¶ 5.) According to Robert Boyd, who serves as the Vice President of Benefits for Windstream Corporation, the 1993 version of the LT&T Employee Handbook was used as the Aliant Plan's Summary Plan Description (SPD). (Id.; compare Pls.' Ex. 2-A with Defs.' Ex. 11.) Thus, the Aliant Plan's SPD includes a reservation of rights similar to the one quoted above.

Aliant also sponsored the Aliant Death Benefit Plan. (Pls.' Ex. 2, Boyd Aff. ¶ 27; Pls.'

Ex. 2-J.) This plan, which provided survivor benefits in the event of an employee's or retiree's death, (Pls.' Ex. 2, Boyd Aff. ¶ 27), includes the following term:

> Article 7.  Amendments
> 
> 7.01 The Board of Directors reserves the right at any time and from time to time, and retroactively if deemed necessary and appropriate to conform with governmental regulations or other policies, to modify or amend in whole or in part any or all of the provisions of the Plan, and to terminate the Plan as to any participating company, but such amendment or termination shall not affect the rights of any employee, pensioner, dependent, or beneficiary without his consent, to any accrued and unpaid benefits to which he may have previously become entitled under the Plan.

(Pls.' Ex. 2-J at 63; Pls.' Ex. 2-K at 54.)

In 1999, Aliant merged into a wholly-owned subsidiary of Alltel Corporation. (Am. Compl., filing 93, ¶ 27; Answer, filing 164, ¶ 27; Pls.' Ex. 2-B.) Boyd states, "Following the merger, Aliant employees and retirees remained on the existing Aliant employee benefit plans until 2002, when they were merged into and became part of . . . the Alltel Comprehensive Plan of Group Insurance (the 'Alltel Plan')." (Pls.' Ex. 2, Boyd Aff. ¶ 6.) "The Alltel Plan provided medical benefits to retirees who had previously worked for Aliant, including the individuals retiring from Alltel and those individuals who retired from Aliant before the 1999 merger." (Id.) The Alltel Plan contains the following reservations of rights:

> 9.01 Amendments.  The Board reserves the right to amend this Plan in whole or in part at any time and for any reason.  The Board has granted amendment authority to the Vice President of HR, Benefits and the Sr. Vice President of Compensation and Benefits, either of whom may approve and adopt any amendment to the Plan.
> 
> 10.01 Right to Terminate.  In accordance with the procedures set forth in this Article, the Board may terminate the Plan at any time.
> 
> 10.02 Plan Termination.  Upon the termination of this Plan, the rights of Participants are limited to expenses incurred before termination.

(Pls.' Ex. 2-C at WIND 369-370.)

After the merger, Aliant employees and retirees remained covered by the Aliant Death Benefit Plan until December 31, 2001. (Pls.' Ex. 2, Boyd Aff. ¶ 28.) According to Boyd, participation in the Death Benefit Plan was frozen in December 2001 "so that benefits were only

3

payable . . . to those employees or retirees who, prior to January 1, 2002, had become totally disabled as a result of sickness or injury, died, or terminated employment after satisfying the requirements for early or normal retirement under the terms of the Plan for Employees' Pensions of Aliant Communications Co. (Id. (citing Pls.' Ex. 2-L).)

In 2006, Windstream Corporation was formed as a result of a merger between Alltel's wireline division and Valor Communications Group. (Am. Compl., filing 93, ¶ 27; Counterclaim, filing 164, ¶ 23.) Windstream Corporation "assumed the responsibility of providing benefits to all former Alltel wireline employees and retirees," including those who had been Aliant employees prior to the 1999 merger. (Pls.' Ex. 2, Boyd Aff. ¶ 9.) To that end, Windstream Corporation established the Windstream Plan, which–at least at the time of its creation–was similar to the Alltel Plan. (See id.) The Windstream Plan includes the following reservations of rights:

> 9.01 Amendments. The Board reserves the right to amend this Plan in whole or in part at any time and for any reason. The Board has granted amendment authority to the Windstream Benefits Committee or its delegate.
>
> 10.01 Right to Terminate. In accordance with the procedures set forth in this Article, the Board may terminate the Plan at any time.

(Pls.' Ex. 2-E at 10.)

Windstream also assumed sponsorship of the Aliant Death Benefit Plan. (Pls.' Ex. 2, Boyd Aff. ¶ 29.) According to Boyd, "[e]ffective July 1, 2006, the Aliant Death Benefit Plan was added as a constituent plan to the [Windstream] Plan." (Id. ¶ 30.)

At some unspecified time prior to August 12, 2008, the Windstream Benefits Committee decided to amend the Windstream Plan to shift costs of certain benefits to "Aliant Retirees," (Pls.' Ex. 2, Boyd Aff. ¶ 17; Pls.' Ex. 2-I.),[2] while eliminating other benefits entirely. More specifically, the contemplated amendments would eliminate the retirees' eligibility to participate

---

[2] I find no helpful definition of the term "Aliant Retirees" in the plaintiffs' evidence, although I note that Boyd seems to imply that the term is coextensive with the "Defendant Class." Class certification is an issue that remains to be resolved, though I note that the parties have filed a "Stipulation and Joint Motion to Certify Class." (See filing 194.) In any case, I find that the individual defendants would be affected by the proposed amendments, and therefore I consider them to be "Aliant Retirees" (as that term is used in the plaintiffs' evidence).

in "the Windstream PPO Plan, the Windstream Indemnity Plan and the Windstream HMO Plan"; make the retirees eligible to participate in a new "Aliant Retiree Medical Plan," which is to be insured by United Healthcare; terminate the Aliant Death Benefit Plan; and alter the terms of the Life Insurance Plan. (Pls.' Ex. 2-I at 1, 3.) The impact of these changes upon the defendants will be described in more detail below. (See infra Part II.A.) The committee's decision to make these amendments was based, in part, on its review of the reservation of rights provisions noted above. (See Pls. Ex. 2, Boyd Aff. ¶ 18.)

On August 12, 2008, the plaintiffs met with a group of retirees to discuss the amendments. (Am. Compl., filing 93, ¶ 46; Answer, filing 164, ¶ 46.) During and after this meeting, a number of retirees made objections to the amendments. (Am. Compl., filing 93, ¶ 47; Answer, filing 164, ¶ 47.) In the wake of these objections, the plaintiffs filed a complaint (see filing 1) and an amended complaint (see filing 93). In their amended complaint, which is brought pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., the plaintiffs seek a declaratory judgment stating that the plaintiffs have the unilateral right to amend or terminate the Windstream Plan, that the proposed amendments are effective and enforceable, and that the amendments do not violate the Windstream Plan or any other operative agreement with the defendants. (Am. Compl, filing 93, ¶ 60.)

The defendants answered the complaint and filed a counterclaim against Windstream Corporation and Windstream Benefits Committee. (See filing 164.) In their counterclaim, the defendants seek to enforce "permanent rights" that the Aliant Plan allegedly provides to former employees of Lincoln Telephone and Telegraph Company, its successor Aliant, and Aliant's successor Alltel. (Counterclaim, filing 164, ¶¶ 1, 20.) The counterclaim, which is based on § 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), includes a request for a preliminary injunction to prevent the plaintiffs from putting the proposed amendments into effect until this litigation is concluded. (Id. ¶¶ 21, 60-61.) My analysis of the defendants' motion for a preliminary injunction follows.

## II. ANALYSIS

"A court considering a motion for preliminary injunction must consider (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury . . . [that] granting the injunction will inflict on the other party; (3) the probability of the movant succeeding on the merits; and (4) the public interest." Phelps-Roper v. Nixon, 545 F.3d 685, 689-90 (8th Cir. 2008). See also Dataphase Sys. Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "A court should balance these considerations when deciding whether to issue an injunction," Mid-America Real Estate Co. v. Iowa Realty Co., Inc., 406 F.3d 969, 972 (8th Cir. 2005) (citation omitted), and "[i]n balancing the equities no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113. It should be noted, however, "that the failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction," Blue Moon Entertainment, LLC v. City of Bates, 441 F.3d 561, 564 (8th Cir. 2006), and that "an injunction cannot issue if there is no chance of success on the merits," Mid-America Real Estate Co., 406 F.3d at 972 (citations omitted).

### A. The Threat of Irreparable Harm to the Movants

The defendants argue that they will face several irreparable harms if their motion for a preliminary injunction is denied. First, they state that they will face "significant" and "substantial" increases in costs for health coverage and health care under the amended Windstream Plan. (See, e.g., Defs.' Ex. 2, Husing Dec. at 10 ("I'll pay more, a lot more. The premiums will be much greater and we will get fewer benefits."); Def.'s Ex. 4, Swails Dec. ¶ 11 ("My family lives on a fixed income . . . . The increase in the amount of health insurance costs, and life insurance costs will eat up a substantial portion of my income.").) Second, they state that United Healthcare, which is to act as the insurer under the plaintiffs' amended health benefits plan, has been subject to fines and operates under a threat to its authority to transact business in the State of Nebraska. (See generally Defs.' Ex. 10, White Aff.) Third, they state that because hospitals and physicians in Hastings, Grand Island, and Kearney will not do business with or treat patients insured by United Healthcare, (see, e.g., Pls.' Ex. 2-H; Defs.' Ex. 2, Husing Aff. at 9-10), the implementation of the amended Windstream Plan will disrupt the defendants'

relationships with their physicians. Fourth, they state that their life insurance premiums will increase, and they will incur significantly higher costs to obtain life insurance to offset the loss of the death benefit. (See, e.g., Defs.' Ex. 2, Husing Dec. at 11-12; Defs.' Ex. 4, Swails Dec. ¶ 12; Pls.' Ex. 2, Boyd Aff. ¶¶ 32-33.)

In opposition to the defendants' motion, the plaintiffs rely heavily on the principle that no threat of irreparable harm exists if any injury that arises prior to the resolution of the litigation can be remedied by an award of money damages. (See Pls.' Br., filing 176, at 20.) See also, e.g., Guy Carpenter & Co., Inc. v. John B. Collins Assoc., Inc., 179 F. App'x 982, 983 (8th Cir. 2006) (citing Gelco Corp. v. Coniston Partners, 811 F.2d 414, 420 (8th Cir. 1987)); Caballo Coal Co. v. Indiana Michigan Power Co., 305 F.3d 796, 801 (8th Cir. 2002). Specifically, the plaintiffs argue that "the mere fact that the [defendants] . . . must change health care plans or pay additional costs is . . . a financial injury that can be compensated through damages," and that "[t]he alleged improper cancellation of the death benefit is also . . . a purely financial injury that can be remedied through reinstatement of the pre-amended version of the Plan." (Pls.' Br., filing 176, at 20.) In short, the plaintiffs submit that because the defendants' "alleged injuries can be remedied at trial by means other than injunctive relief, such as reinstatement of and reimbursement for past benefits," there is no threat of an irreparable injury. Also, the plaintiffs emphasize that the defendants will not be without health coverage under the amended plan, argue that the amended plan will cover 93% of the defendants' costs, and allege that 92% of the "providers" who have served the defendants will also provide service under the amended plan. (Pls.' Ex. 2, Boyd Aff. ¶¶ 20-21.)

There is merit to the plaintiffs' argument that reinstatement and reimbursement are adequate remedies for many of the harms specified by the defendants, and, to the extent that legal remedies such as these are adequate, the defendants' argument that they are threatened with irreparable harm is weakened. Also, I find that it is difficult to gauge the extent of the harm confronting the defendants as a group or class based on the current record. For example, although there is evidence that defendants with health care providers in Hastings, Grand Island, and Kearney, Nebraska, are likely to have their relationships with their physicians disrupted when the amended plan becomes operative, and although it is not apparent that monetary

damages would provide an adequate remedy for this harm, it is not clear how many individual defendants–or what proportion of the proposed class–will face this harm. Similarly, although there is evidence that the amended plan's increased costs will cause "devastating" financial hardships for certain defendants during the pendency of this litigation, (see, e.g., Defs.' Ex. 1, Mather Dec. ¶ 7), the evidence does not reveal the extent to which the defendants are similarly situated in that respect. Thus, the instant case seems to be distinguishable from Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571, 584 (6th Cir. 2006), cited in the defendants' brief at pages 17 and 18, wherein the evidence allowed the district court to "surmise that the putative class members overall cannot afford" increased premiums totaling over $500 per month, and "will lose their health insurance, will not be able to pay for necessary prescription medications, and will not receive all of the medical care they need" while the case is pending. (Emphasis added). On the other hand, the defendants have shown that, generally speaking, the amended plan will cause significant financial disruptions and may also significantly disrupt their relationships with health care providers.

Although the question is close, I conclude that there exists a threat of irreparable harm to the movants that is sufficient to warrant consideration of the remaining Dataphase factors.

### B. The Balance Between the Threat of Harm to the Movants and the Injury that Granting the Injunction Would Inflict on the Plaintiffs

The defendants argue that the balance between the threat of harm to the plaintiffs should the injunction be granted and the threat of harm to the defendants should the injunction be denied favors the granting of the motion for a preliminary injunction. First, the defendants note that because the plaintiffs have provided the benefits at issue for a number of years, and because Windstream Corporation is a large company with significant cash flow, the financial impact of an injunction will affect the plaintiffs far less than the denial of the injunction would affect the defendants. (See Defs.'s Br., filing 175, at 23.) Second, the defendants argue that Windstream was aware of the costs of the benefits allegedly owed to retirees at the time of its formation and has had a clear opportunity to prepare for the proposed changes to the plan. (Id. at 24.) Finally, the defendants state that, because Windstream Corporation (or, more precisely, its predecessor companies) "accounted for post-retirement benefits for its employees during the working lives of

those employees," "there is no credible objection that Windstream can raise based on some financial burden created by the cost of the retirement plans." (Id.; see also Defs. Ex. 7-1 at 6 (indicating that, at least in 1997, Aliant Communications "account[ed] for [postretirement benefits] during the active employment of the participants.").)

In opposition to the defendants' arguments, the plaintiffs assert first that Windstream Corporation "is in a highly competitive and declining business," and that it therefore must make changes in all aspects of its operations in order to remain competitive. (Pls.'s Br., filing 176, at 21 (citing Pls.' Ex. 2, Boyd Aff. ¶¶ 14, 35).) Second, the plaintiffs claim that "it would be exceedingly difficult, if not impossible, for Windstream to unwind the obligations already entered into for 2009 [in connection with the amended plan], and revert to coverage provided in 2008," which in turn would create "a significant risk of a coverage gap for the alleged class members" if the injunction were granted. (Id. at 22.) The plaintiffs add the defendants' failure to move for a preliminary injunction sooner compounded these problems. (See id. at 23.) Third, the plaintiffs argue that Windstream's shareholders "could be adversely affected if Windstream is not permitted to receive the cost savings from the amendment." (Id.)

Bearing in mind that the threat of irreparable harm confronting the defendants is not great, it seems to me that the balance of harms favors neither party's position. The plaintiffs' evidence does seem to suggest that a permanent injunction would affect Windstream Corporation's ability to "remain competitive" over the long term, but it is not clear that a preliminary injunction would have such dire effects on Windstream's competitiveness. (See Pls.' Ex. 2, Boyd Aff. ¶ 34 (citing a 25% decline in "access lines" over ten years and "declines" of 4% to 11% for "the telephone industry in general" over 12 months).) Similarly, the plaintiffs' evidence does not clearly indicate that a preliminary injunction is likely to harm shareholders significantly. (See Pls.' Ex. 2, Boyd Aff. ¶ 38 & Ex. M (indicating that the plan amendments "reduced Windstream's benefit obligation at September 1, 2008 by $67.3 million, with a corresponding decrease in accumulated other comprehensive loss, net of tax").) In short, while there is some evidence that Winstream Corporation would be harmed if the cost savings it seeks are denied, there is no clear evidence of great harm if these cost savings are merely delayed pending the conclusion of a trial. I note too that the defendants' uncontradicted evidence that

9

Aliant accounted for its retirees' benefits during those retirees' active employment seems to suggest that the financial harm facing the plaintiffs is not significant.

The plaintiffs' evidence does suggest that it would be quite difficult to arrange for the benefits currently enjoyed by the defendants to extend into 2009. Also, there is evidence that the granting of an injunction would present a risk of a coverage gap. The January 1, 2009, "deadline" was established by the plaintiffs themselves, however, and their argument that the defendants should bear the risk of the fast-looming deadline lacks persuasiveness given that the plaintiffs themselves commenced this litigation on August 14, 2008, and filed an amended complaint on September 29, 2008–only a few months before their proposed amendments were to become effective.

I find that although the plaintiffs and defendants have each shown that an unfavorable ruling on the instant motion would cause some degree of harm, the harms threatening one side do not significantly outweigh the harms threatening the other.

### C. The Probability of Success on the Merits

In a case such as the instant one, "where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes," a movant need only show that it has a "fair chance of prevailing" on the merits. Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008). I find, however, that the defendants have failed to make this showing.[3]

---

[3]I note in passing that the parties disagree about the standard of review that should be applied to resolve the merits of the defendants' claim. The plaintiffs argue that their interpretation of the relevant plan terms is entitled to deference and can only be reversed if it is "arbitrary or capricious" or an "abuse of discretion." (See Pls.' Br., filing 176, at 18-19 (citing, inter alia, Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109-15 (1989)).) The issue raised by the defendants' claim, however, does not relate to the Windstream Benefits Committee's discretionary authority, as plan administrator, to determine eligibility for benefits or to construe the terms of the plan; rather, the issue is "simply one of contract interpretation." Howe v. Varity Corp., 896 F.2d 1107, 1109 (8th Cir. 1990) (quoting Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1516 (8th Cir. 1988)). I am not persuaded that the "abuse of discretion" standard is applicable in this context. See Halbach v. Great-West Life & Annuity Ins. Co., 522 F. Supp. 2d 1154, 1166 (E.D. Mo. 2007) (citing Bennet v. Conrail Matched Savings

The defendants claim that the plaintiffs cannot amend the plan to limit or terminate their retirement benefits. "Under ERISA, vesting of welfare (such as health) benefits-unlike pension benefits-is not statutory, so '[a]n employer offering welfare benefits may unilaterally modify or terminate benefits at the employer's discretion, so long as the employer has not contracted an agreement to the contrary.'" Crown Cork & Seal Co., Inc. v. International Association of Machinists & Aerospace Workers, 501 F.3d 912, 920 (8th Cir. 2007) (quoting Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002)). The primary issue raised by the defendants' counterclaim, therefore, is whether the proposed amendments to the Plan reduce or eliminate benefits that have already vested. The defendants have the burden of proof on the issue of vesting. Stearns v. NCR Corp., 297 F.3d 706, 711 (8th Cir. 2002) (citing Hutchins v. Champion Intern. Corp., 110 F.3d 1341, 1345 (8th Cir. 1997) ("[T]he burden is on the claimant to show that his welfare benefits had vested under the terms of the plan.")).

"A welfare benefit may vest if a promise to provide vested benefits is 'incorporated, in some fashion, into the formal written ERISA plan.'" Hughes v. 3M Retiree Medical Plan, 281 F.3d 786, 790 (8th Cir. 2002) (quoting Jensen v. SIPCO, Inc., 38 F.3d 945, 949 (8th Cir. 1994)). Therefore, the analysis of the issue of vesting begins with the written plan documents. Id. at 790. Extrinsic evidence may not be considered if the relevant Plan provisions are unambiguous. See, e.g., Jensen, 38 F.3d at 950; Howe v. Varity Corp., 896 F.2d 1107, 1110 (8th Cir. 1990).

As noted above, the Aliant Plan, the Aliant Death Benefit Plan, the Alltel Plan, the Windstream Plan ("the Plan"), and the Lincoln Telephone and Telegraph "Employee Handbook" each have reservation-of-rights provisions providing that the company (or Board or other entity) retained the right to amend or terminate the plan. The Eighth Circuit has held that "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." Stearns, 297 F.3d at 712 (quoting Jensen, 38 F.3d at 950). It has also "held that an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested." Id. (citations omitted). The court explained, "If a

---

Plan Admin. Comm., 168 F. 3d 671, 676 (3d Cir. 1999)). The appropriate analytical framework is outlined below and in Stearns v. NCR Corp., 297 F.3d 706, 710-12 (8th Cir. 2002) and Jensen v. SIPCO, Inc., 38 F.3d 945, 949-52 (8th Cir. 1994).

11

reservation-of-rights provision is facially ambiguous, or if it conflicts with other plan provisions, the court in resolving a dispute over vesting may look at extrinsic evidence to determine whether the parties intended to confer vested retirement health care benefits. But there must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation of rights." Id. (citations omitted). In other words, when a plan authorizes an employer to terminate or modify the plan, benefits are not vested unless there is affirmative vesting language in the plan. Id. (citing Hutchins v. Champion International Corp., 110 F.3d 1341, 1345-46 (8th Cir. 1997)).

      I find that the relevant plan documents include clear reservations of rights that are inconsistent with the defendants' claim that the retirement benefits at issue are vested. (Compare Defs.' Ex. 12 at B-10; Defs.' Ex. 11 at B-11; Pls.' Ex. 2-J at 63; Pls.' Ex. 2-K at 54; Pls.' Ex. 2-C at WIND 369-370; and Pls.' Ex. 2-E at 10 with Crown Cork & Seal Co., Inc., 501 F.3d at 918, 919 (holding that the following term was "fatal to any vesting argument": "Continental hopes and expects to continue the Plan indefinitely, but reserves the right to change or terminate it in the future, subject naturally, to any outstanding contractual agreements."); Stearns, 297 F.3d at 709 (holding that the following provision defeated vesting in the absence of contrary language: "The Company reserves all rights at any time or from time to time to amend the Plan in whole or in part.... The Company reserves the right to change or cancel the Plan, or any benefits under the Plan, at any time. If the Company cancels the Plan or any benefits under the Plan, participation in the cancelled benefits would end on the date of cancellation."); Hughes, 281 F.3d at 792-93 (holding that the following reservation of rights clause was unambiguous: "The Company fully intends to continue this Plan indefinitely, but reserves the right to change or discontinue it if necessary. Such action would be taken only after the most careful consideration."); Howe, 896 F.2d at 1108, 1109 (holding that the following provision constituted and express reservation of rights: "The company hereby reserves the right, by action of the board, to amend or terminate the Plan or Trust at any time, provided no such amendment or termination shall have the effect of diverting the Trust funds to purposes other than the exclusive benefit of the Employees except as provided in Section 7.1. However, the right to amend or terminate the Plan shall not, in any way, affect an Employee's right to claim benefits, diminish, or eliminate any claims for benefits under

the provisions of the Plan to which the Employee shall have become entitled prior to the exercise of the Company's right, through its Board, to terminate or amend.").)

Citing Barker v. Ceridian Corp., 122 F.3d 628, 631 (8th Cir. 1997), Jensen v. SIPCO, Inc., 38 F.3d 945, 949-52 (8th Cir. 1994), and Halbach v. Great-West Life & Annuity Ins. Co., 522 F. Supp. 2d 1154 (E.D. Mo. 2007), the defendants argue that the reservation of rights appearing in the 1987 LT&T Employee Handbook is ambiguous because it states, "A change, however, will not deprive you of your rights to any benefits to which you may have acquired a permanent right." (See Defs.' Br., filing 175, at 13; see also Defs.' Ex. 12 at B-10, H-6, D-3, R-4.) But this reservation of rights is materially indistinguishable from the provision at issue in Howe, which included the language, "However, the right to amend or terminate the Plan shall not, in any way, affect an Employee's right to claim benefits . . . to which the Employee shall have become entitled prior to the exercise of the Company's right . . . to terminate or amend." 896 F.2d at 1108. Moreover, although Barker and Jensen do discuss reservations of rights that were deemed to be ambiguous, the reservations of rights at issue in those cases are readily distinguishable from the reservations of rights at issue in the instant case. First, in Barker, the reservation of rights was accompanied by the following "vesting" language: "If the group Long-Term Disability plan terminates, and if on the date of such termination you are totally disabled, your Long-Term Disability benefits and your claim for such benefits will continue as long as you remain totally disabled as defined by the plan." 122 F.3d at 631, 636. The defendants in the instant case refer me to no language stating specifically that benefits survive the termination of the plan. Second, the reservation of rights in Jensen stated, "Unless otherwise expressly provided therein, amendments shall not be applicable to persons who are receiving pensions hereunder prior to the effective date of such amendment." 38 F.3d at 949. The defendants in this case have referred me to no similar language indicating that amendments are not generally applicable to retirees, pensioners, or the like.

It is true that in Halbach, the district court concluded that a reservation-of-rights provision stating that amendments "shall not divest a Participant of benefits under the Plan to which he has become entitled" was ambiguous because it contained "qualifying language which dictates that if a participant is already 'entitled' to receive benefits, any modification or termination of benefits

will not apply to that participant." No. 4:05Cr02399 ERW, 2006 WL 3206076, at *5 (E.D. Mo., June 6, 2006). See also 522 F. Supp. 2d at 1167 & n.11 (quoting plan language). In other words, the court found that the reservation of rights was ambiguous because it "clearly states that some benefits do vest." 522 F. Supp. 2d at 1167. It seems to me, however, that the court's analysis is in conflict with Crown Cork and Howe, wherein provisions with similar "qualifying language" were found to constitute unambiguous reservations of rights. See Crown Cork & Seal Co., Inc., 501 F.3d at 918, 919 (holding that the reservation of rights was unambiguous despite qualification that it was "subject . . . to any outstanding contractual agreements"); Howe, 896 F.2d at 1109 (holding that the reservation of rights was clear and controlling despite qualification that amendments "shall not . . . affect an Employee's right to claim benefits . . . to which the Employee shall have become entitled prior to the exercise of the Company's right . . . to terminate or amend"). The court in Halbach also seems not to have given due weight to the terms that expressly limited the companies' rights to amend or terminate benefits in Barker and Jensen. I therefore respectfully decline to apply the Halbach court's analysis to the facts of this case.

  The defendants also argue that provisions appearing elsewhere in the 1987 Employee Handbook conflict with the reservation of rights language and thereby give rise to an ambiguity that warrants the consideration of extrinsic evidence. First, the defendants refer me to language included in a chart appearing in the LT&T Employee Handbook. (Defs.' Br., filing 175, at 15.) The defendants argue that the "chart makes clear that the Health Care Program, the Dental Care Program, the Disability and Death Benefit Program, and the Life Insurance Program were dependent on only one qualifying condition – 15 years of service prior to age 65. (Id.) It is true that the chart indicates that the aforementioned benefits may be continued throughout retirement if a retiree has "at least 15 years of Net Credited Service prior to age 65." (See, e.g., Defs.' Ex. 12 at B-11.) It seems to me, however, that this language merely sets the criteria for eligibility for benefits; it does not indicate that the benefits cannot be amended or terminated in the future. Indeed, in Crown Cork, the Eighth Circuit considered and rejected an argument similar to the one raised by the defendants here. In Crown Cork, the defendant asserted that a "ten-year continuous-service minimum requirement to qualify for postretirement health benefits means that

14

such benefits were 'worked towards or accumulated over time' and therefore were accrued." 501 F.3d at 918. The court disagreed, stating, "The minimum service that an employee must have to be eligible to retire with health benefits is not the set-point for vesting of those health benefits after retirement." Id. (emphasis added). As in Crown Cork, the defendants' argument in the instant case appears to confuse eligibility terms with vesting language. I am not persuaded that the chart renders the reservation of rights ambiguous; nor does the chart contain "explicit vesting language." Id.

Next, the defendants refer to language appearing in the "Survivor Benefits" section of the 1987 Employee Handbook stating,

> Coverage During Retirement
> Your Group Life Insurance coverage will continue during your retirement if you have completed 15 years of Net Credited Service before your Normal Retirement Date. The amount of coverage is determined by which plan you choose and your cost will be the same as on the day before your retire. You will pay for your share of the cost by deduction from your monthly pension check.

and,

> Disability and Death Benefits Plan
> The Disability and Death Benefits Plan provides benefits which are designed to help protect your family's financial security if you should die while an active or retired employee. Survivor benefits from the Plan will be paid in addition to any survivor benefits you may receive from the Group Life Insurance Plan, Pension Plan, or Social Security

(Defs.' Br. at 16; see also Defs. Ex. 12 at S-10, S-14 (emphasis added).) The defendants argue that the use of the word "will" in these provisions establishes that survivor benefits are vested. (See Defs.' Br. at 16 (citing Jensen, 38 F.3d at 950).) In Jensen, the Eighth Circuit noted that a provision stating "that benefits will be provided until the retiree dies, or a spouse divorces, or a child marries or reaches age 19" does support "an argument that retiree benefits are vested." 38 F.3d at 950. The court added, however, that "these termination-of-coverage clauses are at most an ambiguous expression of an intent to vest retiree benefits." Id. Moreover, in Howe, the Eighth Circuit observed "that an employer's promise to future retirees that benefits 'will continue' could not be read as a promise of vested lifetime benefits in the face of a termination clause." 896 F.2d at 1109 (citation omitted). More recently, in Crown Cork the court held that

15

the reservation-of-rights provision controlled over promises to extend coverage "until your death" and "after your death," and added that these promises did not constitute explicit vesting language. 501 F.3d at 918. In light of the Eighth Circuit's holdings in Crown Cork and Howe, and because the reservation of rights at issue in Jensen is distinguishable from the reservations-of-rights at issue here (as explained previously), I find that the excerpts from the Survivor Benefits section of the Handbook that are quoted above do not render the reservation-of-rights provisions ambiguous and do not constitute explicit vesting language.

During the hearing, counsel for the defendants highlighted language appearing on pages R-3 through R-4, R-16, R-18 through R-19 of the 1987 Employee Handbook, which is Defendants' Exhibit number 12. I have studied these pages, and I find that they do not indicate in any way that the benefits at issue in this case are vested. Rather, they refer to pension benefits, which, as noted above, are vested under ERISA.

In summary, the defendants have not shown that the retirement benefits at issue in this case are vested. I have been referred to no plan document that contains an express promise to vest these benefits; on the contrary, the relevant documents–including the 1987 LT&T Employee Handbook relied upon by the defendants–include reservations of rights to amend or terminate benefits. I find, based on my analysis of the relevant Eighth Circuit law and the evidence highlighted by the parties, that these reservations of rights are not facially ambiguous and are not in conflict with other plan provisions. Under the circumstances, extrinsic evidence concerning the relevant persons' or entities' intent to vest these benefits will not be considered. E.g., Hughes v. 3M Retiree Medical Plan, 281 F.3d 786, 790, 793 (8th Cir. 2002). In light of the foregoing, I conclude that the defendants have not demonstrated that they have a fair chance of prevailing on the merits.

### D. The Public Interest

The defendants submit that the public interest would be served by a preliminary injunction because an injunction would "keep[] the Retirees from plunging into the welfare abyss if they are forced to choose private health care." (Defs.' Br., filing 175, at 24-25.) They add that the public interest would be harmed if the defendants are compelled to go without insurance

coverage and are left unable "to pay their own medical expenses should any catastrophic event occur." (Id. at 25.) They also argue that the significant disruption that the proposed amendments will cause to the defendants' retirement planning efforts will harm the public at large. In opposition to the defendants' arguments, the plaintiffs repeat the arguments put forth in support of their assertion that the granting of a preliminary injunction would cause harm–specifically, that the injunction would harm Windstream Corporation's competitiveness in the marketplace, would create a risk of a "coverage gap" for the defendants, would cause hardship for the plaintiffs, and would harm Windstream Corporation's shareholders. (See Pls.'s Br., filing 176, at 21-23.)

Although there is little evidence suggesting that the denial of the defendants' motion would cast the defendants, as a group, into a "welfare abyss," the evidence does show that the defendants' retirement plans will be disrupted–and at least in some cases, severely disrupted–by the proposed amendments to the Windstream Plan. On the other hand, the granting of an injunction would require the plaintiffs to make considerable efforts to re-establish the 2008 benefits plans, and the defendants may be left without coverage during the interim. On the whole, I find that the public interest does not significantly favor either granting or denying the defendants' motion.

### E.  The Balance of the Equities

I have considered each of the relevant factors, and I find that the defendants' motion for a preliminary injunction must be denied. The public interest does not weigh in favor of an injunction, and the denial of the defendants' motion would not cause significantly more harm to the defendants than the issuance of an injunction would cause to the plaintiffs (and to the defendants themselves in the event of a coverage gap). Also, it appears that the injuries that might be suffered by the defendants during the pendency of this litigation can, at least to a large extent, be compensated by legal remedies. Finally, the defendants' inability to show that they have a fair chance of succeeding on the merits weighs heavily against the granting of the defendants' motion.

**IT IS ORDERED** that:

1. The defendants' motion for a preliminary injunction, filing 164, is denied;

2. The motion to dismiss filed by Communications Workers of America Union Local No. 7470, filing 159, is denied as moot;

3. The plaintiffs' motion to exclude the expert testimony of Pamela J. Acuff, filing 183, is denied as moot; and

4. The plaintiffs' objections to the defendants' evidence, filing 185, is denied as moot.

Dated December 30, 2008.

                BY THE COURT

                s/ Warren K. Urbom
                United States Senior District Judge