IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WINDSTREAM, Corporation,<br>WINDSTREAM NEBRASKA, Inc.,<br>WINDSTREAM SYSTEMS OF THE<br>MIDWEST, INC., and WINDSTREAM<br>BENEFITS COMMITTEE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | 4:08CV3173 |
| v. | ) ) | |
| ROBERT BERGGREN, Individually and as<br>a Representative of Persons Similarly<br>Situated, LAURIE BAXTER, NEIL<br>BRAUCH, LARRY CHUBB, VIRGINIA<br>DANCZAK, KENNETH DARBY, ROY<br>EDMONDS, DIANE GIEBELHAUS,<br>KENNETH GRAHAM, BONNIE HATRA,<br>HOWARD HIGHT, JUDY HIGHT,<br>LONNIE HUSING, EDWARD JUNGCK,<br>ERVIN MATHER, ROBERT SWAILS,<br>MARY WADE, and DALE WEAVER, | ) ) ) ) ) ) ) ) ) ) ) ) ) | MEMORANDUM AND ORDER ON<br>CROSS MOTIONS FOR SUMMARY<br>JUDGMENT |
| Defendants. | ) ) | |

Now before me are the defendants' motion for summary judgment, (filing 215), the plaintiffs' motion for summary judgment, (filing 218), and the plaintiffs' objections to the defendants' summary judgment evidence, (filings 231 and 239). My analysis of these motions follows.

**I.  BACKGROUND**

Plaintiff Windstream Corporation is a telecommunications company with its principal place of business in Little Rock, Arkansas. (Pl.'s Index, filing 220, Ex. 2, Boyd Aff. ¶ 5.) Plaintiffs Windstream Nebraska, Inc. and Windstream Systems of the Midwest, Inc., are wholly-owned subsidiaries of Windstream Corporation. (Id. ¶¶ 6, 7.) Windstream Corporation is the

1

plan sponsor of the Windstream Comprehensive Plan of Group Insurance (the Windstream Plan), and Plaintiff Windstream Benefits Committee is the administrator of the Windstream Plan. (Id. ¶ 3.)

The defendants are representatives of a class defined as "[a]ll former bargaining and non-bargaining employees of Aliant Communications Co. (Aliant) presently receiving Windstream welfare benefits from the Windstream [Plan] as retirees or as active employees." (Memorandum and Order on Mots. to Certify Class, filing 196, at 5.) This includes "persons who were employed by one or more of the following: (i) Aliant Communications Co., formerly known as Lincoln Telephone & Telegraph Co.; (ii) Aliant Communications, Inc., formerly known as Lincoln Telecommunications, Inc.; (iii) Aliant Systems, Inc., formerly known as LinTel Systems, Inc.; and (iv) Alltel Nebraska, Inc." (Id.)

Lincoln Telephone & Telegraph Co. (LT&T) was formed at an unspecified time, though there are indications that the company came into existence more than 90 years ago. (Defs.' Index, filing 217, Ex. 2, Westphal Aff. ¶ 3.) LT&T maintained "Employee Handbooks" that described benefits afforded to LT&T's retirees, and selected pages of these handbook have been included in the summary judgment record. (See Defs.' Br., filing 216, at 5-6 ¶ 16 (citing Defs.' Index, filing 217, Ex. 2, Westphal Aff., Ex. A).) The pages submitted by the defendants are dated September 1993 and December 1987,[1] and benefits provided under the 1993 handbook are described on pages labeled H-5 and H-6.[2] (See Defs.' Index, filing 217, Ex. 2, Westphal Aff., Ex. A.) The following "reservation of rights" paragraph appears on pages B-11 (dated

---

[1] The defendants also submit that "oral promises referring to permanent rights to benefits were included in . . . Employee Handbooks" that were first published by LT&T sometime during the 1970s, (Defs.' Br., filing 216, at 5 ¶ 14), but no copies of handbooks or plans dating to the 1970s have been included in the summary judgment record, and the defendants have not submitted any evidence of the particular terms that may have appeared in those handbooks or plans.

[2] The defendants define the benefits at issue in this litigation as "health, medical, dental and life insurance, as well as a death benefit." (Defs.'s Br., filing 216, at 1 ¶ 1; see also id. at 1 ¶ 1 n.2.) Little, if any, specific information about the life insurance and death benefits appears on the handbook pages submitted by the defendants. (See Defs.' Index, filing 217, Ex. 2, Westphal Aff., Ex. A.)

2

September 1993), H-6 (dated September 1993), D-3 (dated December 1987), and R-4 (dated September 1993):

> The Company intends to continue these benefit plans indefinitely. The Company reserves the right to modify, suspend, or terminate these benefits. A change, however, will not deprive you of your rights to any benefits to which you may have acquired a permanent right.

(Defs.' Index, filing 217, Ex. 2, Westphal Aff., Ex. A., at 2, 4-6.) On page B-11, this reservation of rights is followed by a paragraph stating:

> The Plan for Employees' Pensions of the Lincoln Telephone and Telegraph Company are [sic] reviewed by the Internal Revenue Service for qualification. The Internal Revenue Service may require some changes in order to qualify the Plan. The Company reserves the right to amend the Plan if so required, and will issue revisions to this Handbook, if necessary.

(Id. at 2.)

In 1996, LT&T changed its name to Aliant Communications Company (Aliant).[3] Aliant sponsored the Aliant Communications Health Care Program (the Aliant Plan), which provided medical benefits for Aliant's retirees. (Pls.' Br., filing 219, at 6 ¶¶ 10-11.) More specifically, the Aliant Plan provided the following benefits:

> Aliant paid 100 percent of the premium cost of medical coverage for eligible retirees. Retirees were still responsible for deductibles, coinsurance, and copays. The amounts and percentages varied depending on the plan the retiree chose. A post-65 retiree had essentially zero out-of-pocket costs after Medicare and company paid reimbursement of Medicare Part B premiums.

(Pls.' Br., filing 219, at 6 ¶ 11 (citations omitted); Defs.' Response Br., filing 234, at 3-4 ¶ 12.) The Aliant Plan also incorporates the reservation of rights paragraph quoted above. (See Pl.'s Index, filing 220, Ex. 2, Boyd Aff., Ex. A, at B-11.) Indeed, it may be that the Aliant Plan is identical to the 1993 LT&T Plan. (Compare Pl.'s Index, filing 220, Ex. 2, Boyd Aff., Ex. A with Defs.' Index, filing 217, Ex. 2, Westphal Aff., Ex. A.)

---

[3]The parties' statements of facts do not specify the date when LT&T became Aliant Communications Company. The pleadings indicate, however, that Aliant Communications came into being in 1996. (See Counterclaim, filing 164, at 10 ¶ 1; Answer to Counterclaim, filing 193, ¶ 1.)

Aliant also sponsored the Plan for Employees' Disability Benefits and Death Benefits of Aliant Communications Co. (the Aliant Death Benefit Plan). (Pls.' Index, filing 221, Ex. 2-J.)[4] This plan, which provided "survivor benefits in the event of an employee's or retiree's death," (Pls.' Index, filing 220, Ex. 2, Boyd Aff. ¶ 31), includes the following term:

> Article 7.  Amendments
> 7.01 The Board of Directors reserves the right at any time and from time to time, and retroactively if deemed necessary and appropriate to conform with governmental regulations or other policies, to modify or amend in whole or in part any or all of the provisions of the Plan, and to terminate the Plan as to any participating company, but such amendment or termination shall not affect the rights of any employee, pensioner, dependent, or beneficiary without his consent, to any accrued and unpaid benefits to which he may have previously become entitled under the Plan.

(Pls.' Index, filing 221, Ex. 2-J at WIND 564.)  Evidently, the Aliant Death Benefit Plan's summary plan description includes the same reservation of rights language that appeared in the 1993 LT&T handbook: "The Company reserves the right to modify, suspend, or terminate these benefits.  A change, however, will not deprive you of your rights to any benefits to which you may have acquired a permanent right."  (Pls.' Br., filing 219, at 13 ¶ 27.)

"In 1999, Aliant merged with Alltel Corporation . . . and adopted the Alltel brand name in the Nebraska market."  (Pls.' Br., filing 219, at 3 ¶ 1.)  Employees and retirees who worked for Aliant prior to the merger remained covered by the Aliant Plan until 2002, when they began to receive coverage under the Alltel Comprehensive Plan of Group Insurance (the Alltel Plan).  (Id. at 7 ¶ 14.)  The Alltel Plan contains the following terms:

> 9.01 <u>Amendments</u>.  The Board reserves the right to amend this Plan in whole or in part at any time and for any reason.  The Board has granted amendment authority to the Vice President of HR, Benefits and the Sr. Vice President of Compensation and Benefits, either of whom may approve and adopt any amendment to the Plan.
> . . . .
>
> 10.01 <u>Right to Terminate</u>.  In accordance with the procedures set forth in this Article, the Board may terminate the Plan at any time.

---

[4]LT&T appears to have sponsored a similar death benefit plan.  (<u>See</u> Pls.' Index, filing 221, Ex. 2-K.)

(Pls.' Index, filing 220, Ex. 2, Boyd Aff., Ex. C, at WIND 369-370.) Also, the Alltel Plan's summary plan description includes the following language:

> As with all provisions of the Plan, the Company expressly reserves the right to amend, modify, terminate, or partially terminate the Plan with respect to retiree and dependent coverage at any time.

(Pls.' Index, filing 220, Ex. 2, Boyd Aff., Ex. D, at WIND 1729, 1959, 2019, 2051, 2103, 2135, 2167, 2211, 2235, 2259, 2525, 2557, 2618.)

"Following the merger, Aliant's employees and retirees remained covered by the Aliant Death Benefit Plan." (Pls.' Br., filing 219, at 13 ¶ 28.) However, the Aliant Death Benefit Plan was amended, effective December 31, 2001, "to freeze participation in the Aliant Death Benefit Plan so that benefits were only payable under the Death Benefit Plan, in general, to those employees or retirees who, prior to January 1, 2002, had become totally disabled as a result of sickness or injury, died, or terminated employment after satisfying the requirements for early or normal retirement under the terms of the Plan for Employees' Pensions of Aliant Communications Co." (Id.. at 13-14 ¶ 28.)

In 2006, Alltel's landline division merged with Valor Communications Group to form Windstream Corporation. (Pls.' Br., filing 219, at 3-4 ¶ 1.) Windstream Corporation then "assumed the responsibility of providing benefits to all former Alltel landline employees and retirees, including the members of the Defendant Class." (Pls.' Br., filing 219, at 8 ¶ 16.) Windstream Corporation established the Windstream Plan, which afforded medical benefits to retirees under terms that are similar to those of the Alltel Plan. (See id.) The Windstream Plan includes the following reservations of rights:

> 9.01 <u>Amendments</u>. The Board reserves the right to amend this Plan in whole or in part at any time and for any reason. The Board has granted amendment authority to the Windstream Benefits Committee or its delegate.
>
> 10.01 <u>Right to Terminate</u>. In accordance with the procedures set forth in this Article, the Board may terminate the Plan at any time.

(Pls.' Index, filing 220, Ex. 2, Boyd Aff., Ex. E, at WIND 385.) On July 1, 2006, the Aliant Death Benefit Plan was added as a constituent plan to the Windstream Plan. (Pls.' Br., filing 219, at 14 ¶ 29.)

It is undisputed that persons who retired from LT&T and its successor companies (collectively, "the telephone company") received certain welfare benefits from the telephone company after their retirement and until the time of their deaths. (See Defs.' Br., filing 216, at 5 ¶ 12; Pls.' Response Br., filing 229, at 4 ¶ 12.) However, the parties dispute whether the telephone company's officers informed employees that, under the terms of the applicable plan, employees were entitled to "lifetime benefits" in retirement that could not be modified or terminated by the company. (Compare Defs.' Br., filing 216, at 4-5 ¶¶ 10-11, with Pls.' Response Br., filing 229, at 3-4 ¶¶ 10-11.) According to the defendants, various telephone company managers promised orally that retirees would receive welfare benefits from the company for their entire lives. (Defs.' Br., filing 216, at 4-8, 14 ¶¶ 10-12, 19-21, 35-36.)[5] For example, Virginia Danczak testified that managers often told her that she would have her benefits when she retired–though I note that she did not identify the managers who made these representations or the dates when these representations were made. (Defs.' Index, filing 217, Ex. 3-G, Danczak Dep. at 43:16-44:5.) Similarly, Lonnie Husing testified that she had been informed over the years that she possessed permanent rights to health and welfare benefits, but she could not recall whether those communications were written or oral, and she could not recall when, where, or by whom those communications were made. (Defs.' Index, filing 217, Ex. 3-H, Husing Dep. at 35:9-36:24.) Larry Chubb testified that Don Eisenbarth, who was "on the bargaining committee back in 1966," told him that benefits were "set up for life." (Defs.' Index,

---

[5]I note in passing that the defendants claim that since 1917, LT&T has made oral promises to provide, and did in fact provide, "Retirement Benefits" to its retirees "until the retirees died." (Defs.' Br., filing 216, at 5 ¶ 12. See also Defs.' Index, filing 217, Ex. 1, Sharp Aff. ¶¶ 10-11; id., Ex. 2, Westphal Aff. ¶ 3.) The defendants do not claim, however, that promises made as early as 1917 constitute an ERISA-governed benefits plan, were premised on an ERISA-governed plan, or represent an interpretation of an ERISA-governed plan. The plaintiffs' claim and the defendants' counterclaim are based on ERISA, and it seems to me that evidence of oral promises is not relevant to the parties' claims unless the promises are shown to relate to an ERISA-governed plan. Furthermore, the affidavits cited by the defendants lack a foundation showing that the affiants have personal knowledge of the making of oral promises dating back to 1917. My review will focus only on witnesses' statements about promises that clearly fall within their personal knowledge and that relate, in some fashion, to the ERISA plans in evidence.

filing 217, Ex. 3-I, Chubb Dep. at 27:22-28:21.) Art Sharp states that James Geist, who served as LT&T's Personnel Director, told employees at unspecified points in time that LT&T would provide them with retirement benefits throughout their lifetimes. (Defs.' Br., filing 216, at 4, 6-8 ¶¶ 11, 19-21 (citing Defs.' Index, filing 217, Ex. 1, Sharp Aff.).) Robert Swails testified that his "first line gang foreman" commented "some years ago" that the workers would get "all these benefits" if they "stay." (Defs. Index, filing 217, Ex. 3-K, Swails Dep. at 41:21-42:9.) Swails added that through the years, employees often talked about their benefits over coffee. (Id. at 42:14-43:14.) The defendants also claim that when the telephone company offered employees an opportunity to participate in a "voluntary early retirement program" known as VERP, the Personnel Department responded to questions about the VERP's effect on retirement benefits by stating that retirees would receive their medical benefits in retirement. (See Defs.' Index, filing 217, Ex. 2, Westphal Aff., Exs. D-J. See also Defs.' Index, filing 217, Ex. 3-A, Wade Dep. at 18:24-21:4; Defs.' Br., filing 216, at 8-13 ¶¶ 22-33.) In contrast, the plaintiffs flatly deny that any promises of "guarantee[d], vest[ed], or . . . permanent" welfare benefits were ever made by any manager or officer who had the authority to make such promises. (Pls.' Index, filing 220, Ex. 1, Hilsabek Aff. ¶ 4; see also Pls.' Response Br., filing 229, at 3-5, 7-13 ¶¶ 10-12, 19-33, 35-36.)[6]

At some unspecified time, Windstream Corporation decided to modify the benefits that were being provided to members of the defendant class. (See Pls.'s Br., filing 219, at 10-11 ¶¶ 20-22.) To that end, the Windstream Plan was amended so as to "require retirees to share a portion of the cost of medical coverage." (Id. at 11 ¶ 22.) The amended Windstream Plan is similar in design "to the Enhanced Option under the Windstream Preferred Provider Organization Plan, to which all other current Windstream employees and retirees have access." (Id. ¶ 23.) Under the amended Windstream Plan, 1) class members receive, during retirement, unlimited lifetime maximum benefits with a $500 annual deductible; 2) the Plan (in combination

---

[6]The plaintiffs do not merely oppose, but also object to much of the defendants' evidence that company managers promised "lifetime" welfare benefits to retirees. It seems to me that some of the plaintiffs' objections have merit. For reasons explained in Part III below, however, there is no pressing need to resolve each of the plaintiffs' evidentiary objections.

7

with Medicare, if applicable) pays 80% of eligible costs beyond the deductible; and 3) the retired class members pay the remaining 20% of eligible costs up to an out-of-pocket maximum of $2500 annually, which includes the deductible. (Id. at 11-12 ¶ 24.) The plaintiffs decided that these amendments would take effect on January 1, 2009. (Id. at 11 ¶ 22.)

The plaintiffs also decided that the Aliant Death Benefit Plan would be terminated on December 31, 2008. (Id. at 12 ¶ 26.) In its place, the plaintiffs would provide "basic life insurance coverage of $5000" to members of the defendant class. (Id.)

The plaintiffs announced these changes in August 2008, and some members of the defendant class disputed the validity of the amendments. (Pls.' Br., filing 219, at 14 ¶ 30; see also Am. Compl., filing 93, ¶¶ 46-47; Answer, filing 164, ¶¶ 46-47.) Thereafter, the plaintiffs filed this action, which is brought pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq. (See Compl., filing 1; Am. Compl., filing 93.) The plaintiffs seek a declaratory judgment stating that the plaintiffs have the unilateral right to amend or terminate the Windstream Plan, that the amendments are effective and enforceable, and that the amendments do not violate the Windstream Plan or any other operative agreement with the defendants. (Am. Compl, filing 93, ¶ 60.) On November 26, 2008, the defendants answered the complaint and filed a counterclaim against Windstream Corporation and Windstream Benefits Committee. (See filing 164.) In their counterclaim, the defendants seek to enforce "permanent rights" that the Aliant Plan allegedly provides to former employees of the telephone company. (Counterclaim, filing 164, at 10, 12 ¶¶ 1, 20.) The defendants also requested a preliminary injunction to prevent the plaintiffs from putting the proposed amendments into effect until this litigation is concluded. (Id. at 29-30 ¶¶ 60-61.) I denied the defendants' motion for a preliminary injunction on December 30, 2008. (See filing 195.)

## II.  STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

8

Civ. P. 56(c). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

### III. ANALYSIS

The central issue in this case is whether the amendments to the Windstream Plan that presumably took effect on December 31, 2008, and January 1, 2009, reduced or eliminated benefits that were "vested" in the class members under the terms of an ERISA-governed employee benefit plan.

It is undisputed that the benefits at issue in this case are welfare benefits, as opposed to pension benefits. ERISA does not mandate vesting for welfare benefits. See Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 877 (8th Cir. 2009); Crown Cork & Seal Co., Inc. v. International Assoc. of Machinists & Aerospace Workers, 501 F.3d 912, 919 (8th Cir. 2007). "Therefore, an employer may unilaterally modify or terminate [welfare] benefits at any time absent the employer's contractual agreement to the contrary." Halbach, 561 F.3d at 877; see also Crown Cork & Seal, Co., Inc., 501 F.3d at 919. "It is possible for welfare benefits to vest, however, if a promise to provide vested benefits is incorporated in some fashion into the formal written ERISA plan." Halbach, 561 F.3d at 877 (footnote omitted). The defendants bear the burden of proof on the vesting issue. Id.; Stearns v. NCR Corp., 297 F.3d 706, 711 (8th Cir. 2002) (citing Hutchins v. Champion Intern. Corp., 110 F.3d 1341, 1345 (8th Cir. 1997).

My analysis begins with a review of the relevant plan terms. Halbach, 561 F.3d at 877; Hughes v. 3M Retiree Medical Plan, 281 F.3d 786, 790 (8th Cir. 2002). As I conduct this review, I must give the relevant language "its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." Halbach, 561 F.3d at 877. Pursuant to the law of trusts, if the plan provision under review is ambiguous, "other evidence of the intention of the settlor with respect to the trust" may be admissible. Id. (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989)). In other words,

> That intent [of the settor] is first sought by careful examination of the trust clause in question, giving the words in that clause their ordinary meanings. If the construction question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the creator's intent and purposes. . . . The third step becomes necessary when the intent or meaning of the settlor . . . cannot be determined by reference to the provisions of the trust instrument itself. [At that point e]xtrinsic evidence will be admitted by the court to assist it in determining the meaning and effect of the particular clause.

Id. at 877-78 (quoting George G. Bogert, et al., The Law of Trusts & Trustees § 182 (rev.2d ed. 1979)).

In accordance with the framework described in Halbach, I shall first examine the reservation of rights provisions appearing in the relevant plan documents. As I noted in my memorandum and order on the defendants' motion for a preliminary injunction, the Eighth Circuit has held that "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." Stearns, 297 F.3d at 712 (quoting Jensen v. SIPCO, Inc., 38 F.3d 945, 950 (8th Cir. 1994)). If a reservation of rights provision is unambiguous, it can only by overcome by "an affirmative indication of vesting in the plan documents." Id. (citing Hutchins, 110 F.3d at 1345-46). If, however, a reservation of rights provision is ambiguous, I must then "follow the dictates of trust law and expand [my] review to examine the entire trust document itself to determine the settlor's intent." Halbach, 561 F.3d at 881. "[I]f the intent of the settlor cannot be ascertained by examination of the trust instrument itself," extrinsic evidence may then be considered. Id.

The defendants argue that the following reservation of rights provision, which appears in

10

the 1987 and 1993 LT&T Employee Benefits Books, the Aliant Plan documents, and the Aliant Death Benefit Plan documents, is ambiguous on its face:

> The Company intends to continue these benefit plans indefinitely. The Company reserves the right to modify, suspend, or terminate these benefits. A change, however, will not deprive you of your rights to any benefits to which you may have acquired a permanent right.

(See Defs.' Br., filing 216, at 5-6, 18-23, 32 ¶¶ 15-16, 49, 56-57; Defs.' Response Br., filing 234, at 13 ¶ 30.)[7] The defendants highlight the last sentence of this provision, which they label the "preservation of benefits" or "preservation of permanent rights" clause, and submit that it renders the reservation of rights ambiguous. (E.g., Defs.' Br., filing 216, at 5-6, ¶¶ 15-16; Defs.' Response Br., filing 234, at 13 ¶ 30.)

In Crown Cork & Seal Co., Inc. v. International Assoc. of Machinists & Aerospace Workers, 501 F.3d 912, 919 (8th Cir. 2007), the Eighth Circuit found that a reservation of rights provision was unambiguous despite the presence of language that, like the "preservation clause" emphasized by the defendants in this case, seems to limit the applicability of future plan amendments. Specifically, the court held that the following language was "fatal to any vesting argument: 'Continental hopes and expects to continue the Plan indefinitely, but reserves the right to change or terminate it in the future, subject naturally, to any outstanding contractual agreements.'" (Emphasis added). Based on Crown Cork and other cases, I found when resolving the defendants' motion for a preliminary injunction that the reservation of rights clause at issue here is not ambiguous. (See filing 195 at 12-14.)

More recently, however, the Eighth Circuit held that the following language was "ambiguous as it relates to [the settlor's] intent to vest":

> 5.1 Amendment of Plan. The Company reserves the right at any time or times to amend the provisions of the Plan to any extent and in any manner that it may deem advisable, by a written instrument signed by an officer of the Company; provided, however, that no such modification shall divest a Participant of benefits

---

[7]I note in passing that the defendants to not argue that the reservation of rights provisions appearing in any other plan documents are ambiguous, nor do they refer me to any "affirmative indication of vesting" in any other plan documents. (See generally Defs.' Br., filing 216.) Their argument–at least as far as step one of the Halbach framework is concerned–is based solely on the LT&T Plan language quoted above.

11

> under the Plan to which he has become entitled prior to the effective date of the amendment.

Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 880 (8th Cir. 2009).

I find, for the purposes of the parties' summary judgment motions, that the reservation of rights provision at issue is rendered ambiguous by the sentence stating, "A change, however, will not deprive you of your rights to any benefits to which you may have acquired a permanent right." As the Eighth Circuit noted in Halbach, this language might refer to so-called "pipeline claims," or it might refer "to the exclusion of certain, already vested, benefits." See 561 F.3d at 880-81 & n5. But see Crown Cork & Seal, Co., Inc., 501 F.3d at 919 ("IAM cannot create an ambiguity simply by saying that it thinks the reservation-of-rights clause can be read to mean something different from Crown's interpretation of the same clause."). This ambiguity requires further analysis of the plan documents.

I proceed, then, to step two of the analytical framework, which requires me to "examine the entire trust instrument to determine the creator's intent and purposes." Halbach, 561 F.3d at 878 (citation omitted). After carefully reviewing the provisions highlighted by the parties, I find that there is no ambiguity, and the benefits at issue in this litigation are not vested.

The defendants have referred me to no specific language indicating that the defendants acquired a "permanent right" to any of the benefits at issue in this case. I have studied their briefs closely, and I have found three distinct arguments that the plan documents raise an ambiguity about the question of vesting. None is persuasive.

First, the defendants argue, "The Employee Handbook contains provisions that identify retirement as the trigger date for entitlement to benefits." (Defs.' Reply Br., filing 240, at 2 ¶ 3.3.) Specifically, they claim that "[p]ermanent rights were acquired upon completing 15 years of Net Credited Service prior to Normal Retirement Age." (Defs.' Response Br., filing 234, at 14-15 ¶ 34.) It is true that the relevant plan documents state that welfare benefits "may be continued throughout your retirement providing you have at least 15 years of Net Credited Service prior to age 65." (Pls.' Index, filing 220, Ex. 2-A at WIND 216.) However, as I explained in the memorandum and order on the defendants' motion for a preliminary injunction,

12

> [T]his language merely sets the criteria for eligibility for benefits; it does not indicate that the benefits cannot be amended or terminated in the future. Indeed, in <u>Crown Cork</u>, the Eighth Circuit considered and rejected an argument similar to the one raised by the defendants here. In <u>Crown Cork</u>, the defendant asserted that a "ten-year continuous-service minimum requirement to qualify for postretirement health benefits means that such benefits were 'worked towards or accumulated over time' and therefore were accrued." 501 F.3d at 918. The court disagreed, stating, "The minimum service that an employee must have to be <u>eligible</u> to retire with health benefits is not the set-point for <u>vesting</u> of those health benefits after retirement." <u>Id.</u> (emphasis added).

(Filing 195 at 14-15.) The 15 years of service required before employees may be eligible for retirement benefits cannot reasonably be read to grant employees a "permanent right" to welfare benefits. Also, I note in passing that the words "may be continued," which appear in the plan documents referenced by the defendants, are distinguishable from the words "coverage will continue during the course of the total disability," which contributed to the Eighth Circuit's finding of ambiguity in <u>Halbach</u>. <u>See</u> 561 F.3d at 881.

Second, the defendants refer me to the paragraph that follows the reservation of rights paragraph appearing on page B-11 of the 1993 LT&T Handbook. (Defs.' Br., filing 216, at 32 ¶ 57.) As I noted above in Part I, this paragraph states,

> The Plan for Employees' Pensions of the Lincoln Telephone and Telegraph Company are [sic] reviewed by the Internal Revenue Service for qualification. The Internal Revenue Service may require some changes in order to qualify the Plan. The Company reserves the right to amend the Plan if so required, and will issue revisions to this Handbook, if necessary.

(Defs.' Index, filing 217, Ex. 2, Westphal Aff., Ex. A., at 2.) The defendants acknowledge that this paragraph addresses pension benefits, which are not at issue in this case. They claim, however, that this paragraph shows that "when the [plaintiffs] wanted to address the Pension Plan, specifically, [they] did so," and therefore the discussion of "permanent rights" in the preceding paragraph must refer to something other than pension benefits. This argument is not persuasive. The plan's reservation of rights to make amendments to the pension plan as required by the Internal Revenue Service does not relate in any way to the question of whether welfare benefits are vested in the defendants.

Third, and finally, the defendants refer me to the "Termination" provision appearing on

13

pages H-47 and H-48 of the 1993 LT&T Handbook, which states,

> Your coverage under the Health Care Programs will end on the earliest of the following dates:
>
> • the last day of the month in which you are no longer an eligible employee or pensioner
>
> • <u>the date the Heath Care Program is discontinued</u>
>
> • the last day of the last month for which you made the required contribution
>
> • the day you exhaust your maximum lifetime benefit, and it is not reinstated (Blue Cross and Blue Shield only)
>
> • six months following termination because of involuntary termination for other than misconduct

(Defs.' Response Br., filing 234, at 15 ¶ 35; Defs.' Response Index, filing 235, Ex. 1-B, at 4-5 (emphasis added).) The defendants argue that this provision "simply restates the Company's reserved right to discontinue the plans, but it also reinforces that a pensioner's right to health care benefits continues unless the pensioner is no longer eligible." (Defs.' Response Br., filing 234, at 15 ¶ 35.) On the contrary, the termination provision clearly states that health coverage <u>will not</u> continue after the Health Care Program is terminated. Indeed, it seems to me that the termination provision constitutes strong evidence that employees do not have a "permanent right" to health benefits, and that there is no ambiguity on the question of vesting.

In <u>Halbach</u>, the Eighth Circuit found, after reviewing the entire trust document, that there was an ambiguity on the question of vesting. The court explained,

> Although the 2004 SPD reiterates the section 5.1 language that Great-West may change, amend or terminate at its discretion, and further sets out that coverage will end on the date Great-West terminates the benefits described in the SPD, it also states that in the case of ineligibility, "[i]f your Service ends due to Illness and you have been approved for LTD benefits, coverage will continue during the course of the total disability," and in the section entitled "How Long Will My Benefits Continue?", it states:
>
> > Your benefits will continue until the earliest of these dates:
> >
> > • The date you are no longer Totally Disabled;

- The date you fail to give proof of your Total Disability as required;

- The last day of the calendar month in which the maximum benefit period ends; or

- The date of your retirement.

561 F.3d at 881. The instant case is clearly distinguishable. As I noted previously, the words "may be continued" appearing in the plan documents cited by the defendants differ from the words "coverage will continue during the course of the total disability." Also, in contrast to the "How Long Will My Benefits Continue?" terms cited in Halbach, here the plan's "Termination" section states specifically that health coverage ends when the benefits are discontinued. (See Defs.' Response Index, filing 235, Ex. 1-B, at 4-5 (reproduced supra).)

In short, the defendants have referred me to no language appearing in any plan documents suggesting that welfare benefits are vested or that employees might have acquired a "permanent right" to the welfare benefits at issue in this case.

The plaintiffs, in contrast, argue that the plan documents not only lack terms indicating that welfare benefits are vested, but also contain a number of provisions that are inconsistent with the vesting of those benefits. (See Pls.' Response Br., filing 229, at 22-24.) For example, in addition to the termination provision quoted above, the plaintiffs note that the plan documents contain a coordination-of-benefits clause, which allows for a reduction in health benefits if the employee or his or her spouse is covered by another "group health program." (See id. at 22 (citing Pls.'s Index, filing 177, Ex. 2-A at H-44).) In Crown Cork, the Eighth Circuit held that a coordination-of-benefits clause was "inconsistent with vesting," stating, "The Plan cannot be interpreted to provide vested rights for prior retirees in one provision and to take such rights away in another." 501 F.3d at 918 (citations omitted). The plaintiffs also note that "the only instances in which words like 'vesting' or 'permanent' are used to describe specific benefits is in conjunction with descriptions of pension, not health, benefits." (Pls.' Response Br., filing 229, at 23.) For instance, page R-6 of the 1987 LT&T handbook states, "[Continuous Service] is also used in determining when you have earned a permanent right to your pension, commonly known

15

as vesting." (Id. (quoting Defs.' Index, filing 181, Ex. 12 (Attach. 3, "Exhibit Part 7"), at R-6 (emphasis added).)

I find, after considering the plan documents identified by the parties, that, when the language of the plan is given its plain, ordinary meaning, the plaintiffs retained the right to amend the welfare benefits afforded to the defendants. When these plan documents are considered as a whole, the term "benefits to which you may have acquired a permanent right," which appears in the reservation of rights provision, can only be interpreted reasonably as a reference to pension benefits that are not at issue in this case. The defendants have not referred me to any plan language that raises ambiguity on this point, and, as noted above, much of the plan language they rely upon is clearly distinguishable from the language highlighted by the Eighth Circuit in Halbach. Because the meaning of the reservation of rights clause is not ambiguous when additional plan language is taken into account, extrinsic evidence concerning the settlor's intent to vest welfare benefits cannot be considered. E.g., Hughes v. 3M Retiree Medical Plan, 281 F.3d 786, 793 (8th Cir. 2002); Howe v. Varity Corp., 896 F.2d 1107, 1110 (8th Cir. 1990). No genuine issue remains for trial, and the plaintiffs are entitled to summary judgment.

As I noted above, the plaintiffs request a declaratory judgment stating, "[1.] Plaintiffs had the unilateral right to amend, modify, or terminate the Plan or any of the provisions contained therein; [2.] the Amendment enacted by Plaintiffs is legally effective and enforceable; [and 3.] the Amendment enacted by Plaintiffs is not violative of the Plan or any other operative agreement with the Defendant Class." (Am. Compl., filing 93, at 23.) I find that the plaintiffs have not shown that they have the unilateral right to amend, modify, or terminate any of the provisions contained within the Plan; indeed, there is no dispute that pension benefits, which are incorporated in the Plan, are vested. They are entitled, however, to a declaration that the amendments at issue in this case are effective, enforceable, and within the plaintiffs' right to make.

**IT IS ORDERED** that:

1. The defendants' motion for summary judgment, filing 215, is denied;

2. The plaintiffs' motion for summary judgment, filing 218, is granted;

3.   The plaintiffs' objections to the defendants' evidence, filings 231 and 239, are denied as moot; and

4.   The plaintiffs are entitled to a judgment declaring that the amendments to the benefits plans that were to become effective on December 31, 2008, and January 1, 2009, are indeed effective, enforceable, and within the plaintiffs' right to make.

Dated August 26, 2009.

                              BY THE COURT

                              s/ Warren K. Urbom
                              United States Senior District Judge